UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MARK BLAKE and BEAU GERTZ,

Plaintiffs,

v.

Case No. 3:24-cv-01359-TJC-PDB

DAVID GOLDNER, et al.,

Defendants.

______________________________________/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT DAVID GOLDNER'S MOTION FOR SANCTIONS PURSUANT TO RULE 11 AND REQUEST FOR RULE 11 SANCTIONS AGAINST MOVANTS AND THEIR COUNSEL**

Plaintiffs Mark Blake and Beau Gertz respectfully oppose Defendant David Goldner's Motion for Sanctions Pursuant to Fed. R. Civ. P. 11 (Doc. 86) (the "Motion"). For the reasons detailed below, the Motion should be denied.

## I. INTRODUCTION

The Motion is predicated on the premise that Goldner was sued for the sole purpose of "manufacturing" venue in this Court, i.e., to avoid bringing this action in the Missouri court where Plaintiffs were tried. Mot. at 3. That premise fails as a matter of law. This RICO case may be brought where any defendant resides. 18 U.S.C. § 1965(a). If Goldner were not a defendant, the suit would be brought where one of the other defendants resides: Minnesota, where defendants Moore and Gleason reside; California, where Cohen resides;

Kentucky, where Oser resides; or Indiana, where Kearney resides. Indeed, no defendant resides in Missouri. The SAC separately pleads venue and jurisdiction because acts in furtherance of the RICO conspiracy occurred here. SAC ¶ 4; *see* 28 U.S.C. § 1391(b)(2). Goldner therefore cannot establish improper purpose merely by quoting paragraphs 2 and 3 while disregarding the additional jurisdictional and venue provisions expressly pleaded in the SAC. Plaintiffs made these points in their Response to the Motions to Dismiss SAC, yet Goldner simply ignores its inescapable logic and repeats his discredited arguments here. For this reason alone, the Court should impose Rule 11 sanctions against him and his counsel for filing a frivolous motion for sanctions. *See* Fed. R. Civ. P. 11, Advisory Committee's Note to 1993 amendment ("As under former Rule 11, the filing of a motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions.") The Eleventh Circuit has affirmed such a sanctions order. *Smith v. Psychiatric Solutions, Inc.*, 750 F.3d 1253, 1260 (11th Cir. 2014) ("Thus, when a Rule 11 motion is filed 'for an improper purpose,' the court may award fees to the target of the motion.").

The Motion also argues that the factual allegations concerning Goldner "have no reasonable factual basis," primarily because the Second Amended Complaint ("SAC") does not allege that Goldner undertook any actions with the other Defendants. Mot. at 12 ("Plaintiffs lump Mr. Goldner together with

the other Defendants in vague allegations regarding all Defendants' alleged agreement to violate RICO."). The law is clear that a defendant can be held liable for a RICO conspiracy without doing anything except embracing the "overall criminal endeavor." He is not required to undertake specific overt acts or even communicate with the other members of the conspiracy. *See, e.g.*, *United States v. Wall*, 116 F.4th 1285, 1298 (11th Cir. 2024) ("To establish a RICO conspiracy under 18 U.S.C. § 1962(d), the government must prove that the defendants 'objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes.'"). An agreement may be shown by "an agreement on an overall objective." *Id.* The same standard applies in civil RICO cases. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997). There is no authority holding that a RICO complaint must allege specific communications involving every member of the conspiracy. It is telling that the Motion fails to cite any authority supporting dismissal of a RICO conspiracy claim on this ground, much less imposing Rule 11 sanctions for such an allegation. The painstaking evidentiary review below demonstrates, this is a harassing frivolous Rule 11 Motion.

The Motion is also premature. The Eleventh Circuit has made clear that Rule 11 motions should not be brought until "the end of the litigation."

*Donaldson v. Clark*, 819 F.2d 1551, 1555 (11th Cir. 1987) (en banc); *see also* *Almeida v. Bennet Auto Supply, Inc.*, 335 F.R.D. 463, 466 (S.D. Fla. 2020) (deferring a premature Rule 11 motion).

## II. THE EVIDENCE SHOWS THAT GOLDNER WAS MOTIVATED TO AND DID ENTER INTO A CONSPIRACY TO HARM PLAINTIFFS

The Motion rests on a premise that Goldner was a stranger to Putnam County Memorial Hospital, the other Blue Cross investigators, and the claims "derived data" narrative set out in the Second Amended Complaint ("SAC"). He was not. The SAC identifies his role in the conspiracy to portray Plaintiffs as participants in massive healthcare billing fraud, the relevant dates, the specific communications, and his part in the events that followed. SAC ¶¶ 6–16. The actual 837I data did not establish that CGH or Putnam performed the tests or that the patients were at the hospitals. The spreadsheets Burns created supplied the corroboration for Goldner's false propositions. SAC ¶ 14; SAC Ex. 1. Goldner's denials do not make that documented distinction sanctionable.

Goldner was the named investigator and point of contact on an August 2016 Blue Cross and Blue Shield Association alert circulated to all participating Blue plans. The alert accused Campbellton-Graceville Hospital ("CGH") of billing drug testing as Place of Service 22 outpatient hospital services and representing that the hospitals performed the tests. SAC ¶¶ 6–7.

Place of Service 22 means that the hospital billed the laboratory claims as if the services were performed at and by the hospital and Florida Blue and Elevance Health relied on that designation to adjudicate and pay the claims.

On August 22, 2016, Goldner and a federal agent confronted CGH about that premise, and Goldner received the reference laboratory agreement between CGH and Plaintiffs' laboratory. SAC ¶ 8. Arranging for a federal agent to join you in a visit to confront hospital management about alleged healthcare billing fraud could not have been spontaneous; it required advance coordination and planning.[1] The next day CGH's lawyer told Goldner that the claims were not billed outpatient services, they were billed as nonpatient services. She asked him for a sample fraudulent claim. SAC ¶ 9.

Goldner could have produced a claim showing POS 22, corrected the alert, or reconciled Gallagher's written challenge with the accusation he was advancing. Despite this opportunity, and with Plaintiffs' laboratory agreement in his possession, on October 14, 2016, Goldner made the false criminal referral advancing the same false POS 22 billing premise. It states that the cases were assigned to him, labels POS 22 as the "Predication," records his continuing work with federal investigators, and directs questions to him. SAC ¶ 10.

[1] Of course Plaintiffs are not privy to all of the communications between the conspirators. They, like the participants in any criminal conspiracy, can be expected to keep a low profile. Much more will be revealed through discovery.

Goldner's false criminal referral concerned fraudulent toxicology billing. The other Defendants later expanded the fraud theory to include blood billing.

The connection to Putnam then became direct. In February 2017, an Elevance Special Investigations Unit investigator contacted Goldner about Putnam and compared Putnam's billing practices and sought his guidance regarding the Florida investigation. SAC ¶ 11.

In March 2017, Goldner was informed that additional data fields were required for the investigation to continue. SAC ¶ 12. That notice gave Goldner another opportunity to address the two false premises in his referral: that the hospitals performed/rendered the services and that the patients were at the hospital. Those fields did not exist in the actual 837I data and were not submitted by any hospital. As a senior insurance company fraud investigator working directly with government fraud investigators, Goldner had a direct responsibility to disclose that fact. Once again, he did not.

The fields law enforcement sought later appeared in the spreadsheets Defendant Burns created for Putnam. The spreadsheets falsely identified the hospital as the Rendering/Performing Provider, falsely added POS 22, and omitted the Attending Provider transmitted in the actual 837I data to incriminate Plaintiffs in healthcare fraud. SAC ¶¶ 13–16; SAC Ex. 1. Those Falsified Spreadsheets thereby corroborated Goldner's false criminal referral and subsequent silence with evidence that CGH's and Putnam's actual 837I

data did not supply. That sequence provides an objectively reasonable factual basis to infer that Goldner knew of and agreed to the conduct; counsel's denial does not eliminate that inference.

As stated above, Goldner's actions can be interpreted as circumstantial evidence that he was taking steps to create a false case of billing fraud. RICO does not require that he communicate with his co-conspirators. Nor did he have to create the spreadsheets personally. His alert, his coordination, planning and subsequent silence with the government, and his false criminal referral supplied the premises that the patients were at the hospital and that the hospital performed the testing. Gallagher challenged those premises in writing, and Goldner was later informed that additional data fields were required for the investigation to continue. Those facts support Goldner's participation regardless of who typed the spreadsheet fields.

## III. CONTEMPORANEOUS DOCUMENTS SUPPORT THE CLAIMS AGAINST GOLDNER

### A. Goldner Advanced POS 22 After CGH's Lawyer Corrected Him

The August 2016 Association alert is not a private investigative note. It was a nationwide communication to all participating Blue plans. It identified Florida Blue as the originating plan and Goldner as the assigned investigator and contact. It stated that rural hospitals billed testing using POS 22, representing that the patients were at the hospital, and that the hospitals

performed the testing. SAC ¶ 6.

The August 22 meeting and the written communications that followed put Goldner on direct notice that CGH disputed his account. SAC ¶ 9.

Gallagher did more than disagree with Goldner. Before Goldner's criminal referral, she identified the precise claims data defect at issue in this case: CGH's billing company reported that the UB claims did not carry POS 22. Goldner nevertheless repeated the false POS 22 premise in his criminal referral. SAC ¶ 9. The referral's section labeled "Predication" states that the services were billed as outpatient hospital services using POS 22. Doc. 57-1 at 5. The report lists other investigative suspicions, but those suspicions do not change the claims data premise the report expressly labeled its predication. None establishes that the hospitals transmitted POS 22 in the actual 837I data. Thus, the premise of the RICO claim against Goldner comes down to his motive. Plaintiffs assert he was lying, not just mistaken. And motive is typically a jury question in RICO cases. *See, e.g.*, *United States v. Abbell*, 271 F.3d 1286, 1301 (11th Cir. 2001) (vacating judgment of acquittal of a RICO conspiracy conviction based upon a defendant's obtaining false affidavits that were used in a later proceeding to obstruct justice, which constituted agreement "to the overall goals of the RICO conspiracy"). Thus, the issue cannot be negated by a lawyer's pleading or mere denial. Much will be gleaned by deposing Goldner and observing his demeanor. *Cf. Boczar v. Manatee*

*Hospitals & Health Systems, Inc.*, 993 F.2d 1514, 1518 (11th Cir. 1993) (holding that the defendant's role in an antitrust conspiracy presented a jury question based in part on evidence of "fabricating damaging incidents" and vacating judgment for the defendant). And there are a myriad of federal cases against insurance-fraud and other investigators for fabricating evidence to advance their employer's objectives. *See, e.g.*, *Burge v. Ferguson*, 619 F. Supp. 2d 1225 (M.D. Fla. 2008) (allowing a civil rights case against a Medicaid-fraud investigator to proceed); *Anthony v. Baker*, 767 F.2d 657, 660 (10th Cir. 1985) (permitting a civil rights and malicious prosecution case against a fraud investigator to proceed based on fabrication of evidence and presentation of false evidence to a grand jury). Although *Boczar*, *Burge*, and *Anthony* are not direct Rule 11 or RICO sanctions authorities, they are instructive by analogy because they address fabricated incidents or evidence and the fact intensive inquiry into the responsible actor's role, motive, and credibility.

**B. Goldner Was Connected to Putnam and to the Missouri Claims**

Goldner calls himself a disinterested outsider with no tie to Putnam or the Missouri litigation. Mot. at 4-6, 12, 16-20. The February 2017 email contradicts that characterization. An Elevance fraud investigator wrote Goldner directly about Putnam, compared Putnam's billing practices with CGH's. SAC ¶ 11. Goldner's tie to Putnam is undeniable. The connection does not depend on whether Goldner answered in writing.

Defendants Gleason and Moore made the same connection with Plaintiffs. RightCHOICE's Fourth Amended Complaint stated that the Putnam arrangement followed a similar arrangement at CGH, that loss of access to CGH created the need for another billing hospital and that testing initially intended for CGH was later billed through Putnam and treated blood testing were included within the same alleged pass through billing scheme. *RightCHOICE Managed Care, Inc. v. Hospital Partners, Inc.*, No. 5:18-cv-06037-DGK, Doc. 310 ¶¶ 3, 98, 114, 151, 154 (W.D. Mo. Sept. 17, 2019). The Government's factual basis for David Byrns's guilty plea likewise connected CGH and Putnam in relation to blood and toxicology testing and described the Putnam events as occurring shortly after the earlier CGH events. *See United States v. Byrns*, No. 3:19-cr-166-TJC-JRK, Doc. 12 at 29 - 31 (M.D. Fla. Oct. 29, 2019). Goldner's argument that the initial referral did not yet name Putnam does not erase his later, documented Putnam connection and how blood was later treated the same as toxicology.

Nor does Florida Blue's status as a nonparty to the Missouri action sever the connection. Gleason and Moore stated that Florida Blue assigned to RightCHOICE the legal claims for money owed because of the Putnam scheme. *RightCHOICE* Doc. 310 ¶¶ 67(g), 68. RightCHOICE pursued those assigned Blue plan claims in Missouri. Goldner's employer therefore did not need to appear as a named plaintiff or issue policies in Missouri for its claims related

to Putnam to be part of that case.

**C. Goldner Was Informed That the FBI Would Close the Investigation Unless More Data Fields Were Provided**

The March 2017 communication is central. It gave Goldner notice that additional data fields were required for the investigation to continue. SAC ¶ 12. The comparison of the actual 837I data with Burns's spreadsheets shows the separate fact that the hospital performance and patient location entries appeared in the Falsified Spreadsheets, not in the actual 837I data. SAC ¶ 14; SAC Ex. 1. The actual 837I data was always insufficient to establish that the services were performed at or by the hospitals or that the laboratories made medical necessity decisions. Goldner's silence allowed the investigation to continue while Burns created the documentary evidence that made insufficient evidence appear sufficient.

**D. The Later Use of the Same Fields Shows Why Goldner's Decisions Were Material**

The performing/rendering-provider and place of service fields were not collateral. At the October 22, 2021 status conference before this Court, DOJ Attorney Winters distinguished the submitter field from the Rendering Provider field and stated "And that's what's shown on the claims spreadsheets that the insurers have provided to us many years ago, and that we've turned over to the defendants." *United States v. Jorge Perez, et al.*, Case No. 3:20-00086-TJC-SJH (M.D. Fla. 2020), *Perez Status Conf*. Tr. 59:22 - 60:17 (Oct. 22,

2021) (Ex. A). On November 18, 2021, after the civil verdict against Plaintiffs, RightCHOICE represented in Missouri that Putnam was identified as the Rendering Provider and that Putnam's TIN and NPI identified the laboratory that performed the tests and triggered payment. Mo. Dkt. 793 21–22 (Nov. 18, 2021) (Ex. B). Mr. Winters relied on the spreadsheet fields, and RightCHOICE later used those fields to assert that the tests were performed at and by Putnam. That premise came from Burns's "derived data" in the Rendering Provider and Place of Service fields, not Putnam's actual 837I data. At the first criminal trial, the Government told this Court that, without the claims spreadsheets, "there would be no trial forward." Perez Trial Tr. vol. III, 294:23–295:4 (May 12, 2022) (Ex. C).

In granting bond pending appeal, this Court recognized that the Perez brothers' sufficiency challenge presented a substantial question, although the Court had previously rejected it. The Court explained that an appellate ruling of insufficient evidence would require outright reversal. *United States v. Perez*, No. 3:20-cr-00086-TJC-SJH, Doc. 1207 at 3-4 (M.D. Fla. Jan. 10, 2025). The Falsified Spreadsheets supplied the evidence that the services were performed at and by the hospitals and that the laboratories made medical necessity decisions, evidence that the actual 837I data did not contain, allowing Goldner's false premise to become a concerted narrative across the Blue Cross Blue Shield plans.

Goldner's role did not depend on personally editing a spreadsheet. He advanced the POS 22 despite Gallagher's written challenge, received the Putnam inquiry, and was copied when Florida Blue was told its production failed to meet law enforcement's request and remained silent. Those documents supplied a reasonable prefiling basis to connect his conduct to the later spreadsheets Burns later created to prove healthcare fraud.

Because none of the Defendants corrected the false premise, the Government again argued on June 24, 2026, that the defendants committed fraud by misrepresenting that the hospitals performed the tests. *Perez* Oral Arg. Tr. at 10, *United States v. Perez*, No. 24-13762 (11th Cir. June 24, 2026) (Ex. D). The spreadsheets also enabled the Government's medical necessity argument by omitting the Attending Provider names transmitted in the actual 837I data, thereby making it appear that the laboratories made medical necessity decisions. Although that argument occurred after the SAC was filed, it shows that the false premise that services were performed at and by the hospitals, which Goldner advanced after Gallagher's written challenge and law enforcement's request, remained consequential years later.

## IV. GOLDNER'S DENIALS DO NOT ESTABLISH A RULE 11 VIOLATION

### A. Separate Employment and the Absence of Direct Contact With Every Defendant Are Not Dispositive

The SAC correctly states that Goldner worked for Florida Blue rather

than Elevance. SAC ¶ 6. It identifies coordinated conduct through the Blue Cross Blue Shield Association licensees, cross-plan communications, law-enforcement referrals, and a later specific law-enforcement request. SAC ¶¶ 6–16. As stated above, a RICO conspiracy need not be proved by a written agreement or direct contact with every participant. It may be inferred from participant conduct and circumstantial evidence of the scheme. *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1202–03 (11th Cir. 2025). Goldner's acts, read in the context of the SAC, show his role in the conspiracy to obstruct justice in a specific way that advanced the overall endeavor. It is therefore not frivolous or sanctionable, at least not at this stage of the case. Rule 11 sanctions are warranted only when a pleading "(1) has no reasonable factual basis; [or] (2) is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law." *Gulisano v. Burlington, Inc.*, 34 F.4th 935, 941–42 (11th Cir. 2022). The Motion does not show that the allegations against Goldner have no reasonable factual basis. If those allegations are found to be true by the jury, Goldner could be found to have violated RICO.

Moreover, there was no "improper purpose" in filing the case in this District. As indicated above, venue is not proper in Missouri, where Goldner contends the case should have been filed. The RICO venue statute is predicated upon residency, and none of the Defendants resides in Missouri. Venue is

proper because Goldner resides in this District, 18 U.S.C. § 1965(a), and because a substantial part of the events or omissions giving rise to the RICO claims occurred here, 28 U.S.C. § 1391(b)(2).

## V. PLAINTIFFS CONDUCTED A SUBSTANTIAL PREFILING INQUIRY

Before filing the SAC, Mark Blake reviewed the actual 837I data; the claims spreadsheets Burns created for CGH and Putnam; the Association alert; records of the CGH meeting; OPM investigator Derek Holt's analysis; counsel's emails; Goldner's criminal referral; the Putnam communications; the March 2017 notice that additional data fields were required for the investigation to continue; RightCHOICE's Fourth Amended Complaint and post-verdict filing; and the criminal trial transcripts. He also considered the insurers' failure to produce the actual 837I data to this Court, his April 27, 2021 appearance before this Court stating that the insurers were concealing evidence, this Court's repeated directives to produce that evidence, and Moore's refusal to comply. SAC Ex. 6. Plaintiffs' counsel also obtained expert analyses comparing the actual 837I data with the Falsified Spreadsheets. These actions are more than sufficient to defeat the assertion that the SAC lacked evidentiary support.

The comparison was specific. Plaintiffs do not claim that adding ordinary payment or administrative information made a spreadsheet false. They identified three changes that transformed the meaning attributed to the actual

837I data: the addition of POS 22, the identification of the hospitals as the Rendering/Performing Provider, and the omission of the Attending Provider. SAC ¶ 14; SAC Ex. 1. Those entries addressed the location where the patient was tested, who performed the test, and who made the medical necessity decision for the test. They concerned the same matters addressed in Goldner's alert and criminal referral, the March 2017 data request, the Missouri judgment, and the criminal convictions. Plaintiffs' prefiling comparison gave them a substantial factual basis to include Goldner as a named defendant.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court deny the Motion and impose Rule 11 sanctions on Movant and his counsel for abusing the Rule.

Respectfully submitted this 2nd day of October, 2026.

By: /s/ Mark T. Blake
Mark T. Blake, Esquire
Florida Bar No. 368881
MARK T. BLAKE, LL.M. P.A.
914 Poinciana Lane
Winter Park, FL 32789
(813) 480-6828
marktblake111@gmail.com
Counsel for Plaintiffs

By: /s/ Howard Foster
Howard Foster
FOSTER PC
155 N. Wacker Drive, Suite 4250
Chicago, IL 60606
(312) 726-1600
hfoster@fosterpc.com
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 2, 2026, the foregoing was filed using the Court's CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/ Mark T. Blake